(No. 87-CC-1256—

CARLOS MOORE, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 6, 1988.*

CARLOS MOORE, *pro se*, for Claimant.

NEIL F. HARTIGAN, Attorney General (KAREN KEPLER and ERIN O'CONNELL, Assistant Attorneys General, of counsel), for Respondent.

RAUCCI, J.

This is a medical malpractice claim brought by Claimant, a resident of Stateville Correctional Center. The complaint alleges that Claimant suffered permanent injuries, as well as temporary pain and suffering, from delay in receiving medical treatment. While it appears on the face of the record that Claimant did not suffer any permanent injuries from the medical attention, or lack of medical attention, that he received, it appears by the preponderance of the evidence that Respondent failed in its duty to provide Claimant with medical care in a reasonable amount of time following an injury. As a result he endured eight days of unnecessary pain and suffering.

On the afternoon of Sunday, November 2, 1986, Claimant was playing football in the yard. He caught the ball and was running. He got tackled and three players fell on his left leg. When he tried to get up he couldn't walk. His left foot had been twisted behind him and the ankle broken in two places. Two of the players carried Claimant to the cellhouse. From there he was carried on a stretcher to the emergency room. His ankle was swollen and discolored.

The doctor told him he had just twisted his ankle, gave him a cane and some aspirins and made him walk back to the cellhouse:

"A. Then they brought a stretcher from the hospital, and carried me to the emergency room, and the doctor started doing that, and it was swollen and

different colors and stuff. And, I told him what happened, and he told me it ain't nothing but twisted, and I told him I thought I heard a snap, and he gave me a cane and some aspirins and made me walk back to the cellhouse."

The doctor told him that there was no X-ray technician on hand.

Claimant's foot continued to swell and give pain, so that on Monday, November 3, 1986, at about 9:30 in the morning, Claimant was again taken to the institution hospital. The doctor gave him pain killers, and told him there was nothing he could do because there was no X-ray technician available.

"A. They didn't do nothing, but look at it, pull it up and look at it, you know, and say there ain't nothing he can do until he can determine whether it's broken or not; until we can take the x-rays."

This time Claimant could not walk. So he was given crutches to get back to his cell. There he went to bed and his food was brought to him on trays.

Tuesday, November 4, 1986, he could not walk so he was taken on a wheeled cart to the emergency room.

He was again given pain killers and told that because it was election day there was no X-ray technician available. He was returned to his cell on the wheeled cart. His leg was swollen from his toes to the middle of his shin. You couldn't see his ankle and his toes were swollen to twice their normal size.

The pain killer which he took every two or three hours did not relieve the pain.

Wednesday morning, November 5, 1986, he was taken to the emergency room in a wheel chair. X rays were taken which showed that his ankle was broken in two places. Thus, although the injury occurred on Sunday, there was no X-ray technician on duty until Wednesday. Considering the fact that Stateville maintains a hospital on the grounds, and considering the

size of the inmate population, it does not seem reasonable that for three days there should be no X-ray technician available and no way for an injured inmate to get an X ray.

As a result of the X rays, Claimant was scheduled to go to an outside hospital in Joliet on Thursday, November 6, 1986, to have a cast put on the leg.

At about 7 o'clock in the morning on Thursday, November 6, 1986, two officers came to Claimant's cell to get him to go to the hospital. With assistance from the two officers to see that he wouldn't fall, he walked to the gate on crutches. At the gate (which is immediately outside the room where Court of Claims hearings take place) he was told to sit down while he was handcuffed and chained to the crutches. Because of the manner in which he was chained to the crutches he found he could not maneuver himself through the gate. The crutches extended sidewards in such a fashion that he could not balance himself.

"A. As I was going out this gate here, they had handcuffed me to the crutches, and I was trying to walk. I'm telling them I can't walk with handcuffs here like this, because the crutches are too far out. And so, the Captain and Price right here, told me if I can't walk on my own I can't go. I'm trying to explain to him that my leg is broken in two places, I cannot walk handcuffed to this. So, he said, if you can't walk, send him back to the cellhouse. So, they sent me back to the cellhouse. I told the captain it was the best I could do. I explained to him my leg was broken in two places, it's been broken since Sunday. I say, 'I can't walk no faster, it's hard for me to hold these crutches and trying to walk while I am handcuffed.' "

A counselor by the name of Melody Dunlap suggested that Claimant be put in a wheel chair to get him through the gate.

"A. She told Captain Price, 'Why don't you get the man a wheelchair,' and that's when he got mad, and told them to take me back to the cellhouse.

Q. So, a counselor, Melody Dunlap, suggested to Captain Price that he get you a wheelchair?

A. Yes.

Q. And he refused, and sent you back to the cell?

A. Yes.

Q. So then what happened?

A. Go back to the cellhouse, and I tell the Captain in the Cellhouse, and the supervisor what happened, and they said, I don't believe that I said the man stopped me from going on my medical writ, because I wasn't walking fast enough. So, they went up there, and talked to the captain, and talked to one of them staff workers in the hospital, and they told him that orthopedic was coming out here at 1:00 to put the cast on your leg. So, I come back up here at 1:00.

Q. With the crutches again?

A. No, I am in a wheelchair."

In other words, because of the arbitrary and capricious refusal of the officer at the gate to let Claimant go through the gate chained to a wheelchair, even though Claimant had a medical writ, he was returned to his cell and the institution paid the orthopedic surgeon to come from his office in Joliet to examine Claimant at Stateville.

Since the emergency room is located inside the gate no new problem arose. Dr. Duffey got to the emergency room at about 1:45 p.m.

"Q. All right, What happened?

A. Then he looked at my leg, and was looking at the x-rays, and he asked me, why didn't I come this morning, and I told him what happened. He told me, well, there ain't no problem. So, he said I am going to reschedule me, so they are going to reschedule me in the morning now. He rescheduled me for next Tuesday.

Q. This was Thursday afternoon?

A. Yes.

Q. And you were rescheduled for next —

A. Tuesday.

Q. For the following Tuesday, nine days after the incident?

A. Nine days after my leg was broken."

Dr. Duffey put a splint on Claimant's leg. Claimant could not walk and his meals were still being brought to him in the cellhouse. He continued to take Motrins every three or four hours.

On Sunday, November 9, 1986, a week after the injury, Claimant's parents came to visit him.

"A. My folks come out to see me, and wanted to talk to the Warden, and wanted to know why it took so long for me to get a cast put on my leg. And, the Warden told them that he didn't know nothing about this, you know, and I explained to him what happened. So, instead of going Tuesday, Monday they finally took me out."

So on Monday, November 10, 1986, Claimant, handcuffed and chained to a wheel chair, passed through the gate and was taken to Dr. Duffey's office in a station wagon. Five days after the guard refused to let Claimant go through the gate he finally got to Dr. Duffey's office.

Dr. Duffey put a cast on Claimant's leg and gave him more Motrin. Claimant was returned to the institution, and put to bed in the institution hospital where he remained until Wednesday, November 12, 1986.

As a result of the failure of the institution to have available an X-ray technician until three days after Claimant broke his ankle, and as a result of the totally unreasonable refusal of the gate keeper to let Claimant pass through the gate handcuffed and chained to a wheel chair, when he could not handle crutches, Claimant did not get a cast put on his ankle until eight days after he broke it.

Claimant would not have had the cast put on until Tuesday, November 11, 1986, if Claimant and his parents had not managed to bring the matter to the personal attention of the warden. The appointment with the doctor was then changed from Tuesday to Monday.

For a period of six to eight weeks after the cast was put on Claimant did not go to the mess hall because he was on crutches. His food was brought to him. In December Claimant accidentally got the cast wet and it

was removed in the emergency room. The swelling had gone down in the calf and X rays showed that the ankle was healing. Dr. Duffey made a couple of follow-up visits and prescribed therapy and special shoes.

Claimant has some residual complaints—the leg swells periodically and gets numb—but basically he has made a good recovery. He is the cell house painter in his cell house, that is to say he paints the cells on all five galleries. As the only cell house painter in B East he works seven days a week, eight hours a day, and is able to climb up and down ladders.

"Q. And then whatever discomfort you feel in your foot, hasn't interfered with your carrying out your duties in working almost eight hours a day?

A. It don't stop me from painting. It don't stop me from painting.

Q. And describe for me the symptoms of discomfort that you have.

A. It gets numb at times, and if you walk too much or start jogging, and swells up, you know. I do it like that, and I hear the popping—the bone pops."

When asked why being the cell house painter kept him occupied seven days a week, he replied

"A. You have 300 some guys in the one building, you know, putting their feet on the wall, putting their hands on the wall, throwing this and that. It's constantly painting, you know."

At the conclusion of Claimant's case the assistant Attorney General moved for a directed verdict on the grounds that Claimant had not made a *prima facie* case of medical malpractice. The crux of the case is not permanency, *i.e.*, the minor symptoms of discomfort Claimant experiences from time to time. The crux of the case is the fact that the institution was incapable of X-raying Claimant for three days after he was injured. He was initially misdiagnosed as having sprained his ankle, and thereafter for two days told that nothing could be done for him because there was no X-ray technician

261

available. When it was ascertained that his ankle was in fact broken and he had a medical writ to leave the institution to see Dr. Duffey, a guard wilfully, in a fit of temper, refused to let him pass through the gate because he was not able to handle his crutches, thereby delaying him from getting a cast put on his leg for another five days. The warden, being informed of the matter, rectified it as best he could by moving up the medical appointment one day. But a week had already gone by when the warden heard about the matter.

Once Dr. Duffey put the cast on Claimant's leg the pain started to subside.

It is therefore ordered, adjudged and decreed that Claimant be awarded the sum of $1,000.00 for the eight days of needless pain and suffering he experienced until the cast was finally put on his leg.